**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JAMES MICHAEL LITTLETON,**

        **Plaintiff,**

**v.**                             **CIVIL ACTION NO. 3:10-00239**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

        **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATIONS</u>**

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Claimant's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433. This case was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). The case is presently pending before the Court on the parties' cross-motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 11 and 12).

The undersigned United States Magistrate Judge has fully considered the evidence and the arguments of counsel.  For the reasons set forth below, the undersigned proposes and recommends that the United States District Judge find that the decision of the Commissioner is supported by substantial evidence and should be

affirmed.

## I.    <u>**Procedural History**</u>

Plaintiff, James Michael Littleton (hereinafter "Claimant"), filed a DIB application on January 23, 2007, alleging disability beginning September 5, 2005 due to daily headaches; pain in his neck, left shoulder, lower back, hip, and knees; numbness in his hands, feet, and arms from the elbows down; his fingers seizing up; occasional depression; limited ability to walk and balance due to problems with his hips, lower back, and knees; neck problems which interfere with his ability to look down; shoulder problems which cause an inability to reach overhead; hand problems which limit gross and fine manipulation; limited lifting and carrying; limited ability to interact with others due to depression; joint arthralgia; and knee and shoulder injuries. (Tr. at 89). His application was denied initially and upon reconsideration. (Tr. at 44-46 and 50-52).

Claimant then filed a timely request for a hearing, which was held on October 23, 2008 before the Honorable Rosanne M. Dummer, Administrative Law Judge (hereinafter "ALJ"). (Tr. at 19-39). By decision dated February 26, 2009, the ALJ determined that Claimant had not been under a disability as defined by the Social Security Act. (Tr. at 6-18). The ALJ's decision became the final decision of the Commissioner on January 6, 2010 when the Appeals Council denied Claimant's request for review. (Tr. at 1-3). On March 5, 2010, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Docket No. 2). The Commissioner filed his Answer on May 14, 2010 and a transcript of the administrative proceedings. (Docket Nos. 9 and 10). The parties filed their briefs in support of judgment on the pleadings on June 16, 2010 and July 16, 2010. (Docket Nos.

11 and 12). The matter is, therefore, ripe for resolution.

## II.   **Summary of the ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant

work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 404.1520a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20

C.F.R. § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 404.1520a(d)(3).

In this case, the ALJ determined that Claimant met the insured status requirements for DIB through December 31, 2010 and had not engaged in substantial gainful activity since the alleged disability onset date of September 5, 2005; thereby, fulfilling the first step of the sequential evaluation. (Tr. at 11, Finding Nos. 1 and 2). At the second step of the analysis, the ALJ concluded that Claimant had severe impairments of degenerative changes of the lumbar and cervical spine and both shoulders (status post left shoulder arthroscopy in 2000). (Tr. at 11, Finding No. 3). The ALJ also considered Claimant's additional impairments of right knee pain (status post arthroscopy in 1997) and depressive disorder and found them to be less than severe. (*Id.*) At the third step of the evaluation, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 14, Finding No. 4). The ALJ then found that Claimant had the residual functional capacity ("RFC") to do the following:

> Lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk six hours total in an eight-hour workday; and sit six hours total in an eight-hour workday. The claimant can occasionally climb ramps/stairs, balance,   kneel,   crouch,   and   crawl.   He   can   never   climb

> ladders/ropes/scaffolds. Due to limitations of the left shoulder, the
> claimant has slightly decreased range of motion, and reaching is slightly
> decreased, to frequent not constant. He is limited to frequent but not
> constant use of the hands for handling, fingering, and feeling (giving the
> claimant the benefit of the doubt); and he must avoid concentrated
> exposure to heat/cold, vibrations, and hazards (machinery, heights, etc.)

(Tr. at 14, Finding No. 5).

As a result, the ALJ concluded that Claimant could not return to his past relevant work as an unskilled warehouse worker, which required medium to heavy exertion as performed by Claimant. (Tr. at 17, Finding No. 6). The ALJ considered that Claimant was 51 years old on the alleged disability onset date, defined as an individual closely approaching advanced age, had the equivalent of a high school education, and could communicate in English. (Tr. at 17, Finding Nos. 7 and 8). As such, transferability of Claimant's job skills was not material to the determination of disability, because the Medical-Vocational Rules, 20 C.F.R. Part 404, Subpart P, Appendix 2, supported a finding that Claimant was "not disabled," whether or not his job skills were transferable. (Tr. at 17, Finding No. 9). Relying upon the testimony of the vocational expert, the ALJ determined that Claimant could perform "light level" jobs such as amusement/recreation attendant, machine tender, and counter clerk. (Tr. at 17-18, Finding No. 10). Accordingly, Claimant was not under a disability as defined by the Social Security Act and was not entitled to benefits. (Tr. at 18).

## III.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. In *Blalock v. Richardson*, 483 F.2d 773 (4th Cir. 1972), the Fourth Circuit Court of Appeals defined substantial evidence as the following:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, *supra at* 776, quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* The Court's responsibility is to "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The ultimate question for the Court is whether the decision of the Commissioner is well-grounded, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).  The Court decides "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d585, 589 (4th Cir. 2001).

## IV.    **Claimant's Background**

Claimant was 54 years old on the date of his administrative hearing. (Tr. at 22). He attended high school through the eleventh grade and obtained a general education diploma (GED). (Tr. at 23). He can read, write, and complete mathematical problems. (Tr. at 24). He was a warehouseman for a grocery wholesaler for nearly 23 years, from

September 23, 1982 until September 5, 2005. (Tr. at 90).

## V.   Challenges to the Commissioner's Decision

Claimant contends that the decision of the Commissioner is not supported by substantial evidence because (1) the ALJ failed to properly set forth Claimant's limitations with regard to his upper extremities, (2) the ALJ's definition of "light work" did not comply with the Department of Labor's definition, (3) the ALJ failed to articulate good cause for the weight given to the treating physician's opinion, (4) the ALJ based the credibility finding on incorrect facts, and (5) the ALJ failed to consider that Claimant would turn 55 years old within six months of her decision. (Pl.'s Br. at 6-9).

In response, the Commissioner argues that (1) the medical evidence supports the ALJ's RFC finding regarding Claimant's upper extremities; (2) the ALJ's standing/walking determination is not inconsistent with the Department of Labor's definition of "light work;" (3) Claimant failed to identify any relevant, probative evidence from an acceptable medical source that supported his claim.  In addition, a review of the decision reveals that the ALJ considered and weighed all of the relevant opinion evidence and then properly articulated her reasoning for adopting certain opinions; (4) the ALJ did not misstate the evidence when evaluating Claimant's credibility; and (5) Claimant fails to explain why the fact that Claimant was six months from turning 55 years old on the date of the ALJ's decision was an "important factor" for the ALJ to consider; particularly, as a gap of six months is not considered a "borderline" age situation that would warrant consideration of whether Claimant should be given the benefit of a higher age category.  (Def.'s Br. at 10-20).

- 8-

## VI. __Medical Records__

The Court has reviewed the medical evidence in its entirety and will briefly summarize the records below. A portion of the evidence pre-dates Claimant's alleged disability onset date of September 5, 2005; it is included in the discussion to help establish Claimant's medical background.

### A. Pre-onset Records

On March 2, 2000, Claimant was reportedly injured at work when he was kneeling on his right knee and a forklift operator set a forklift down on his right heel causing him to lunge away from the forklift and land on his left shoulder. (*See* Tr. at 266).

On July 31, 2000, Claimant received a left shoulder arthroscopy; a subacromial decompression, including subacromial bursectomy, and a coracoacromial ligament release and acromioplasty from Jack Steel, M.D., at St. Mary's Hospital to assess his left shoulder pain/chronic impingement and to rule out a superior labral tear. (Tr. at 144). His postoperative diagnosis listed (1) chronic impingement, left shoulder and (2) subacromial bursitis with supraspinatus tendonitis. (*Id.*)

Claimant subsequently received many sessions of physical therapy from Generations Physical Therapy at the referral of Dr. Steel. (Tr. at 146-265). He did well in the postoperative period and was eventually dismissed from physical therapy. (*See* Tr. at 267, 273).

On September 21, 2000, Generations Physical Therapy tested Claimant's ability to perform frequent lifting tasks. (Tr. at 147-149). Physical therapist Eric Tarr noted that

an objective measurement of Claimant's lifting capacity revealed that he was capable of performing all of the prescribed exercises at strength levels above the 25th percentile benchmark; therefore, he was not found to have a strength deficit in all of the exercises that he was asked to perform. (Tr. at 147). His maximum acceptable weight was 100 pounds on an occasional basis and 70 pounds on a frequent basis, which corresponded to the "heavy" physical demand level defined by the United States Department of Labor. (*Id.*)  Measurement of his functional strength capacity determined that he was not capable of performing two of six isometric strength exercises at safe levels; therefore, he was found to have a strength deficit in certain segments of his body biomechanically stressed by the test. (Tr. at 152).

On November 13, 2000, Robert Lowe, M.D., from Scott Orthopedic Center noted that Claimant was working and had reached maximum medical improvement for the conditions encountered, although the numbness in his fifth finger had not been precisely defined and might require further study. (Tr. at 271). His shoulder was at maximum medical improvement, but his cervical spine could deteriorate with time. (*Id.*) Using the American Medical Association (AMA) Guide, Dr. Lowe opined that Claimant had a 4 percent impairment of the body as a whole. (Tr. at 272).

On January 2, 2003, Claimant was reportedly injured again at work; he was lifting an order to place on a pallet when he felt pain in his lower back. (*See* Tr. at 293).

On January 29, 2003, a MRI of Claimant's lumbar spine without contrast taken at Putnam General Hospital showed lateral disc herniation at L4-5 with borderline neural foraminal stenosis and a lesion within the anterior aspect of the T11 vertebral body. (Tr. at 303).

- 10-

On February 7, 2003, a bone scan taken to assess Claimant's back pain showed a normal exam, particularly with reference to the thoracolumbar junction.  (Tr. at 311).

### B. Post-onset Records

Although there is not a specific record relating to Claimant's alleged onset date, he states that on September 5, 2005, he was injured at work "for the last time" and stopped working. (Tr. at 24).

On September 18, 2005, five views of Claimant's cervical spine showed that his neural foramina was patent, there was no fracture or subluxation, and there were mild degenerative changes. (Tr. at 310). X-rays also showed no acute bony abnormality and degenerative changes about the acromioclavicular joint in both of his shoulders. (*Id.*) Three views of his right knee showed no acute bony abnormality or joint effusion and no significant joint space narrowing. (*Id.*)

On September 26, 2005, Claimant was seen by Michael W. Gibbs, M.D., at Family Medical Center – Merritts Creek, complaining of pain in his knee, lower back, and shoulders, stating that he was lifting a heavy piece of equipment from the top of a pallet and stepped back off of the pallet and had knee pain. (Tr. at 316). He had notable widening of the patella and medial meniscal tenderness, but no ligamental laxity and no other findings on examination. (*Id.*) Dr. Gibbs did not take Workers' Compensation claims so he referred Claimant to Charles E. Giangarra, M.D. (*Id.*)

On October 11, 2005, Dr. Giangarra noted that Claimant was referred to him for problems with his right knee, neck, both shoulders, and upper and lower back secondary to a work-related injury, which Claimant stated occurred when he stepped up on a step while carrying a 50-pound case of food and slipped, injuring the aforementioned areas

- 11-

in an attempt to maintain his balance. (Tr. at 321). Dr. Giangarra noted that Claimant's recent x-rays were negative and he felt no need to repeat them, stating that he believed that Claimant's problems were soft tissue related and did not rise to any surgical condition. (Tr. at 322). Dr. Giangarra recommended physical therapy. (*Id.*)

On January 14, 2006, a MRI was taken of Claimant's cervical spine without contrast, which showed that Claimant's vertebral height and alignment were normal, his marrow signal was normal, his spinal cord was normal in appearance, there was a posterior bulging annulus at C4-5, and there was no focal disc herniation. (Tr. at 324).

On January 10, 2006, Dr. Giangarra noted that Claimant ambulated without any noticeable limp; his cervical spine revealed an excellent range of motion; and he had a slight limitation in lateral bending in both directions, complaining of trapezial pain. (Tr. at 320). Dr. Giangarra was at a loss to explain Claimant's symptoms from the twisting injury or the mechanism injury, but Dr. Giangarra did believe Claimant had the problems of which he complained. (*Id.*)

On March 4, 2006, a MRI was taken of Claimant's lumbar spine without contrast, showing that his vertebral bodies were normal in height and alignment; there was some disc desiccation throughout his lumbar spine except for some sparing at the L3-L4 level; there was some minimal anterior osteophyte formation from L1 to L3; at L4-5, there was some mild disc space narrowing, mild bulging with adjacent bony proliferation and some facet osteoarthritis; and there was no acute disc herniation or spinal canal or neural foraminal stenosis. (Tr. at 323). The impression was degenerative changes with no acute abnormality or significant stenosis. (*Id.*)

On March 27, 2006, Dr. Giangarra noted that an independent medical evaluation (IME) completed by Dr. Bachwitt provided Claimant with an 8 percent whole percent impairment and cleared Claimant for light or sedentary duty work only. (Tr. at 319).

On April 24, 2006, Dr. Giangarra noted that a functional capacity evaluation performed at Generations Physical Therapy indicated that Claimant was currently relegated to sedentary to light demand work and Dr. Giangarra did not believe that Claimant could return to a heavy level job. (Tr. at 318).

On May 4, 2006, Tiffany Bryan, a master's degree level physical therapist, from Generations Physical Therapy Centers, completed a functional capacity evaluation (FCE) report, concluding that Claimant tested at the sedentary physical demand level. (Tr. at 405). Ms. Bryan stated that although Claimant's performance on the Maximum Voluntary Effort Test and his Waddell signs showed that his test results were an accurate description of his FCE, his "Matheson test results indicated a submaximal performance [was] suspected." (Tr. at 404).

On January 30, 2007, Dr. Giangarra noted that Claimant reported that he continued to have pain in multiple areas of both shoulders, both knees, his lower back, and neck pain. (Tr. at 317).

On March 6, 2007, Wilfredo N. Molano, M.D., examined Claimant for the West Virginia Disability Determination Service (hereinafter "DDS"), noting that an earlier MRI showed that Claimant might have degenerative disc disease, but his latest MRI of the lumbar spine and neck did not show any pathology. (Tr. at 329). Claimant complained of weakness in his hands, legs, and feet. (Tr. at 332). He had questionable positive Tinel sign on his left side; however, there was no atrophy of the thenar

eminences. (*Id.*) He had limited shoulder flexion and adduction. (*Id.*) His effort was fair to poor. (*Id.*) He possibly had symptoms of degenerative arthritis of the spine and left shoulder. (*Id.*)

On March 23, 2007, Jane M. Smith, a single decision maker, completed a physical RFC assessment of Claimant's current condition, noting the following:

- Claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk and sit with normal breaks for about 6 hours in an 8-hour workday; and push and/or pull an unlimited amount, other than as shown for lift and/or carry.

- Claimant could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders/ropes/scaffolds.

- Claimant had no manipulative, visual, or communicative limitations.

- Claimant should avoid concentrated exposure to extreme cold and hazards.

(Tr. at 339-343). Ms. Smith noted that Dr. Giangarra agreed with the physical therapist's assessment that Claimant was only capable of performing sedentary to light work and could not return to heavy level work. (Tr. at 344). She found Claimant partially credible, indicating that he complained of difficulty writing and had his wife complete his function report because of that problem. (Tr. at 345).

On March 23, 2007, Karl G. Hursey completed a psychiatric review technique, finding that Claimant did not have a medically determinable psychiatric impairment. (Tr. at 347). Mr. Hursey noted that Claimant's activities of daily living were only limited by physical problems and that he had no past or present treatment, medications, or diagnosis for mental impairments. (Tr. at 359). He further noted that although Claimant was followed by physicians for multiple health problems, he was never diagnosed with

or treated for emotional problems. (*Id.*) Claimant reported "occasional depressed mood," but nothing more definitive.  (*Id.*)

On August 13, 2007, Elizabeth Durham, M.A., licensed psychologist, completed a mental status examination for DDS. (Tr. at 365-368). Ms. Durham diagnosed Claimant with Major Depressive Disorder, single episode, moderate due to his claims of depressed mood, diminished interest in activities, feelings of worthlessness, and difficulties sleeping. (Tr. at 367). Claimant's prognosis was fair. (*Id.*) His persistence and pace were within normal limits. (Tr. at 368).

On September 15, 2007, Debra Lilly, Ph.D., completed a psychiatric review technique, assessing Claimant from his alleged onset date through the date of her report. (Tr. at 371). Dr. Lilly determined that Claimant had non-severe major depression, which rendered him mildly restricted in "activities of daily living;" "maintaining social functioning;" and "maintaining concentration, persistence or pace." (Tr. at 371, 374, and 381).   Claimant had no "episodes of decompensation." (Tr. at 381). Dr. Lilly noted that Claimant's diagnosis was based upon his reported symptoms, but there were no severe limitations reflected in the medical evidence. (Tr. at 383). She considered Claimant to be credible. (*Id.*)

On September 20, 2007, Marcel Lambrechts, M.D., completed a physical RFC assessment of Claimant's current condition, noting the same exertional limitations as Ms. Smith found in her March 23, 2007 report, except finding that Claimant was limited in pushing/pulling in his upper extremities because of some decreased range of motion in shoulders; however, Dr. Lambrechts noted that Claimant's cooperation and effort were minimal. (Tr. at 387). Dr. Lambrechts noted less postural limitations than Ms.

- 15-

Smith, finding that Claimant could frequently stoop and could occasionally climb ramps/stairs/ladders/ropes/scaffolds, balance, kneel, crouch, and crawl. (Tr. at 388). Dr. Lambrechts noted that Claimant was limited in reaching in all directions because of slightly decreased range of motion in his shoulders, but this was questionable due to Claimant's poor effort. (Tr. at 389). Dr. Lambrechts found that Claimant should avoid concentrated exposure to extreme heat and cold, vibration, and hazards. (Tr. at 390). Dr. Lambrechts stated that Claimant's symptoms seemed magnified; his efforts in the range of motion test were unsatisfactory and questionable. (Tr. at 391).

On May 8, 2008, Ahmet Ozturk, M.D., of Cabell Huntington Hospital Regional Pain Management Center, noted that x-rays of Claimant's cervical spine showed a small calcification at anterior aspect C5-6, some straightening of facet contours on the left, and extension/flexion x-rays did not show any segmental motion abnormality. (Tr. at 410). A MRI of Claimant's cervical spine showed a small midline bulge at C4-5 that was slightly indenting the dura, but not causing spinal stenosis or neural foramina narrowing. (*Id.*) It also showed a small midline bulge at C5-6, but without spinal stenosis or neural foramina narrowing. (*Id.*) Dr. Ozturk's impression was cervical facet syndrome on the left and cervical discopathy at C4-5. (Tr. at 411).

On July 28, 2008, David L. Caraway, M.D., Ph.D., Medical Director of St. Mary's Medical Center, dictated a letter to Dr. Gibbs, noting that Claimant was presently complaining of left mid-back pain around the left shoulder blade; bilateral knee pain, much worse on the right than the left; and secondary diffused pain. (Tr. at 413). His January 14, 2006 MRI was normal, although he had some mild disc bulge. (*Id.*) A MRI of his lumbar spine revealed degenerative changes. (*Id.*) Presently, he had a full range of

- 16-

motion of the cervical spine and upper extremities; abduction beyond 90 degrees on the left was painful; internal and external rotation was nearly full, although he described discomfort; he had tenderness to palpitation over the rhomboid muscle area and the medial aspect of the left scapula, but not the right; he had good range of motion of the lumbar spine; straight leg test was negative bilaterally; deep tendon reflexes were brisk and symmetrical throughout. (*Id.*) In summary, Claimant was a patient with multiple pain complaints, but his most significant findings are of left scapular and rhomboid area pain and right knee pain. (*Id.*)

## VII.   <u>Analysis</u>

### A.   **Claimant's Upper Extremities**

Claimant asserts that the ALJ erred in finding that Claimant had the RFC to use his hands frequently. (Pl. Br. at 6). Citing to a May 18, 2008 history and physical examination report prepared by Dr. Ahmet Ozturk, Claimant argues that the evidence "clearly shows" that he suffers from "very limited" use of his upper extremities. (*Id.*) As such, the above-stated finding by the ALJ plainly contradicted the evidence. (*Id.*) Claimant takes further issue with the ALJ's determination that Claimant's ability to reach is only "slightly limited." (*Id.* at 6). According to Claimant, this finding is inherently inconsistent with the ALJ's other finding that Claimant has severe impairments of both shoulders.  (Pl.'s Br. at 7).

The ALJ specifically found that "[d]ue to limitations of the left shoulder, the claimant has slightly decreased range of motion, and reaching is slightly decreased, to frequent not constant.  He is limited to frequent but not constant use of the hands for handling, fingering and feeling (giving the claimant the benefit of the doubt)." (Tr. at

- 17-

14).  Asserting that these findings are erroneous, Claimant points to a single notation in Dr. Ozturk's May report, which states that Claimant's "upper extremity movements are very limited . . . but non painful." (Tr. at 411).  Claimant fails to appreciate, however, other substantial evidence which supports the ALJ's RFC findings. An example is the portion of Dr. Ozturk's May report adjacent to the notation in question, which documents Dr. Ozturk's physical examination of Claimant's upper extremities.  This record verifies that Claimant's upper extremities had no apparent physical abnormalities, joint swelling, edema, or bruising; his muscle strength was only slightly decreased on the left side and without evidence of muscle wasting; his sensory examination was normal; there was no apparent circulation problem; and deep tendon reflexes were 2+ and symmetrical.  (*Id.*).   In essence, no objective physical findings substantiated or explained Claimant's limited ability to move his upper extremities.

Furthermore, other records suggest that Claimant's limitation of movement was related more to a lack of effort than to actual physical impairment.  For example, on March 6, 2007, Dr. Molano noted that Claimant had limited shoulder flexion and adduction, but commented that Claimant's effort was only fair to poor. (Tr. at 332). Similarly, on September 20, 2007, after completing a review of Claimant's medical records, Dr. Lambrechts found evidence of decreased range of motion in Claimant's shoulders, but emphasized that Claimant's cooperation and effort were felt to be "minimal." (Tr. at 387).  Dr. Lambrechts also noted that Claimant was restricted in the ability to reach in all directions due to "slightly decreased" range of motion of shoulders, but questioned whether this restriction was secondary to Claimant's poor effort. (Tr. at 389). Dr. Lambrechts concluded that Claimant's symptoms seemed magnified and that

his effort in range of motion tests was unsatisfactory and questionable. (Tr. at 391).

Notably, on July 28, 2008, Dr. David Caraway examined Claimant at the request of Dr. Gibbs, Claimant's family doctor.   (Tr. at 413-414).   Dr. Caraway found that Claimant had full range of motion of the cervical spine and upper extremities; findings that entirely rebutted Claimant's statements of restricted shoulder movement.   Also at odds with Claimant's allegations, Dr. Caraway opined that Claimant's MRI of January 2006 was essentially normal except for a mild disc bulge and was "not impressive."  (Tr. at 413).

Dr. Ozturk evaluated Claimant temporally between Dr. Molano's 2007 evaluation and Dr. Caraway's 2008 evaluation. Therefore, the ALJ could reasonably conclude that Claimant exerted the same fair to poor effort during Dr. Ozturk's examination as he did with Dr. Molano. In fact, the ALJ found Claimant's credibility to be "poor," specifically referring to his inadequate effort during Dr. Molano's examination, as well as the many inconsistencies between his stated symptoms and the objective evidence. (Tr. at 16). Nonetheless, as stated in her decision, despite the fact that the most recent evaluation by Dr. Caraway substantiated that Claimant had full range of motion of the cervical spine and upper extremities, (Tr. at 413), the ALJ afforded Claimant the benefit of the doubt in finding that he had slightly decreased range of motion and reaching ability. (Tr. at 14).

Moreover, contrary to Claimant's conclusory assertion, the ALJ's finding that Claimant had severe impairment of both shoulders did not contradict her RFC finding regarding the functional limitations related to Claimant's upper extremities.   The effect that a severe shoulder impairment and secondary decrease in range of motion have on a

claimant's capacity to work is established by conducting an individualized function-by-function analysis.   The results may vary with the individual.   Accordingly, there is nothing intrinsically inconsistent about the concept of a severe impairment that only slightly impedes an individual's ability to perform certain basic work activities.

In this case, the ALJ fulfilled her duty to evaluate the functional impact of Claimant's severe shoulder impairment on his ability to perform certain tasks.   Based upon the medical source opinions, the ALJ found that even with a decreased range of motion, Claimant's abilities to reach and use his hands were only slightly impaired.   The medical records substantially support this determination. Therefore, the undersigned respectfully **PROPOSES** that the United States District Judge **FIND** that the ALJ's RFC assessment of Claimant's upper extremities was supported by substantial evidence.

### B.    Light Work

Claimant next argues that the ALJ's definition of "light work" does not meet the Department of Labor's definition as required by Social Security Ruling (SSR) 83-14.[1] (Pl.'s Br. at 7). He contends that the ALJ relied solely on Claimant's ability to lift and carry 20 pounds occasionally and 10 pounds frequently in reaching the conclusion that Claimant could perform light work. (*Id.*)  In doing, so, the ALJ ignored the concurrent exertional limitations for standing, sitting, and walking that constitute the remainder of the definition.   (*Id.*)   Contrary to Claimant's assertion, the ALJ's findings regarding

---

[1] Claimant relies on SSR 83-14; however, this ruling clarifies how the Medical-Vocational Rules "provide a framework for decisions concerning persons who have both a severe exertional impairment and a nonexertional limitation or restriction." Therefore, it is unclear why Claimant references SSR 83-14 as his argument does not pertain to nonexertional limitations. Rather, he argues that the definition of light work includes not only the exertional limitations with regard to lifting, but also those of standing, sitting and walking." (Pl.'s Br. at 7).

Claimant's ability to stand, walk, and sit are consistent with the Department of Labor's definition of "light work." Light work "requires a good deal of walking or standing" or involves "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b) (2009). More specifically, "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday" and "[s]itting may occur intermittently during the remaining time." SSR 83-10. Therefore, the ALJ's finding that Claimant could "stand/walk six hours total in an eight-hour workday" and "sit six hours total in an eight-hour workday," (Tr. at 14, Finding No. 5), was entirely consistent with the specifications of light work as defined in the regulations and social security rulings. *See, e.g., Davis v. Astrue*, 2008 WL 2566199, *19 (N.D.W.Va. 2008) ("the ALJ's conclusion Claimant could sit or stand/walk for up to 6 hours of an 8-hour workday merely evidenced the ALJ's belief Claimant could meet the sitting/standing/walking requirements of light work").

Claimant then posits that the ALJ's finding that he could stand/walk for six hours total and sit for six hours total in an eight-hour workday was not supported by the evidence of record; namely, the FCE performed by Generations Physical Therapy Centers (hereinafter "Generations"). (Pl.'s Br. at 7). According to Claimant, the ALJ relied on this FCE in determining that Claimant could meet the lifting requirements of light work, but disregarded the portion of the FCE that documented Claimant's significantly limited ability to stand, only 11 minutes and 10 seconds unsupported before experiencing discomfort, and his moderately limited ability to walk. (*Id.*) Claimant adds that the ALJ incorrectly decided that Claimant gave a sub-maximal performance during his FCE although the examiner reported that Claimant demonstrated maximum

voluntary effort. (Pl.'s Br. at 8). Finally, Claimant states that the consultative agency reviewers should have been provided a copy of the FCE to consider in making their assessments. (*Id.*)

On May 4, 2006, Ms. Bryan, a physical therapist, completed a FCE on behalf of Generations, finding that Claimant could lift 20 pounds on an occasional basis and 10 pounds on a frequent basis. (Tr. at 401-406). Ms. Bryan stated that these limitations fell within "the sedentary physical demand characteristic level as defined by the U.S. Department of Labor." (*Id.*) However, as correctly stated by the ALJ, Ms. Bryan's findings actually satisfied the Department of Labor's definition of "light work."[2] (Tr. at 16). Therefore, the ALJ's RFC finding for lifting/carrying was consistent with Ms. Bryan's FCE.

Ms. Bryan's FCE also indicated that Claimant was "moderately limited to stand unsupported for 11 minutes and 10 seconds before experiencing discomfort" and that he was "moderately limited to walk 0.50 miles in 21 minutes and 44 seconds." (Tr. at 405). Claimant emphasizes that these findings are inconsistent with the functional capacity required to perform light work. Therefore, the ALJ's RFC determination was inconsistent with Ms. Bryan's FCE. Assuming *arguendo* that the ALJ's RFC finding is inconsistent with Ms. Bryan's RFC, Claimant fails to cite to any regulation or case law that requires the ALJ to adopt the opinions of Ms. Bryan or even explain inconsistencies between her findings and the ALJ's RFC. Ms. Bryan, as a physical therapist, is

---

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

considered an "other source," rather than an "acceptable medical source" under the regulations. 20 C.F.R. § 404.1513; SSR 06-3p. In keeping with the regulations, Ms. Bryan's opinions regarding what Claimant could still do despite his impairments were not accorded controlling weight and need not be provided the same level of consideration as an accepted medical source opinion. *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (recognizing that a physical therapist is an "other source" whose opinion is afforded significantly less weight). In addition, the determination of RFC is an administrative finding on an issue that is reserved for the Commissioner. SSR 96-5p. The ALJ is obligated to give careful consideration to all available information, weigh the evidence, and reach a conclusion that is substantially supported by the record. SSR 96-8p. The ALJ is not required, however, to adopt any particular source's opinion *in toto,* if the ALJ determines that the opinion is not consistent with other significant evidence of record. Here, substantial evidence supported the ALJ's RFC determination. Dr. Lambrechts, an "acceptable medical source," found on September 20, 2007 that Claimant was capable of standing/walking and sitting with normal breaks for about six hours in an eight-hour workday.[3] (Tr. at 387). The ALJ considered this opinion in relation to the other opinions and provided a written analysis of the available information, which sufficiently explained her conclusions.[4] Accordingly, the ALJ fulfilled her duty to consider all of the evidence in reaching an individualized RFC.

---

[3] Ms. Smith made the same finding on March 23, 2007; however, her professional qualifications are not listed in the record. (Tr. at 339).

[4] Claimant argues that the consultative examiners should have been provided with a copy of Ms. Bryan's FCE to consider in making their decisions. Claimant provides no support for this assertion in the regulations, Social Security Rulings, or case law. Consequently, the undersigned declines to recognize a duty in this case that does not exist in the governing law.

Claimant's asserts that "the ALJ incorrectly stated that the claimant gave a sumbaximal (sic) performance during his functional capacity evaluation," (Pl.'s Br. at 7), implying that her mistaken assumption resulted in a skewed RFC assessment.  However, the ALJ's statement that "submaximal performance was suspected on part of the functional capacity assessment" was accurate. (Tr. at 16). The evaluation notes that although Claimant's performance on the Maximum Voluntary Effort Test and his Waddell signs showed that his test results were an accurate description of his FCE, his "Matheson test results indicated a submaximal performance [was] suspected." (Tr. at 404). Therefore, the ALJ correctly stated that evidence.  In any event, the notation in the Generations FCE regarding Claimant's effort was not an isolated observation. Claimant's apparent lack of effort during evaluations was similarly noted in the records of other examiners.

Therefore, the undersigned respectfully **PROPOSES** that the United States District Judge **FIND** that the ALJ's finding concerning Claimant's ability to perform "light work" was consistent with the definition of the Department of Labor and all applicable regulations, rulings, and case law.

### C.    Treating Physician

Claimant relies upon SSR 96-2p and SSR 96-8p as bases for his third assertion of error.  SSR 96-2p provides that an ALJ must always give good reason for the weight given to a treating source's opinion, and SSR 96-8p states that the RFC assessment must always consider and address medical source opinions. (Pl.'s Br. at 8). Claimant contends that the ALJ erred in not addressing and resolving contradictions between the opinions of Claimant's physicians and those of the agency's evaluator. (Pl.'s Br. at 9). Claimant

further alleges that although multiple sources found Claimant to be severely limited in the use of his hands and arms, the agency's evaluator simply disregarded this evidence. (*Id.*). Of particular note to this discussion, Claimant fails to designate the medical records, or portions of medical records, that purportedly conflict with the ALJ's decision or with the agency evaluator's opinions.

By all appearances, this allegation of error is merely a restatement of Claimant's first challenge to the Commissioner's decision. (Pl.'s Br. at 6). As previously discussed, a review of the transcript of proceedings confirms that the ALJ's RFC finding was supported by substantial evidence. Contrary to Claimant's assertion, there is very little conflict between the records of his treating physicians and the agency evaluator's opinions related to Claimant's limitations of his upper extremities. On January 10, 2006, Dr. Giangarra noted Claimant had excellent range of motion of his cervical spine. (Tr. at 320). On April 24, 2006, Dr. Giangarra reviewed a FCE completed by Claimant's physical therapists which indicated that Claimant was limited to sedentary to light level work; Dr. Giangarra agreed that Claimant could not return to a heavy demand job. (Tr. at 318). On May 4, 2006, Ms. Bryan from Generations stated that Claimant tested at the sedentary demand level. (Tr. at 405). On September 20, 2007, agency examiner Dr. Lambrechts doubted Claimant's decreased range of motion in his shoulders and limited reaching ability, noting that Claimant's cooperation and effort were minimal. (Tr. at 387 and 389). On May 8, 2008, as noted in Claimant's first argument, Dr. Ozturk found that Claimant's upper extremity movements were limited, but not painful. (Tr. at 411). Finally, on July 28, 2008, Dr. Caraway stated that Claimant had a full range of motion of his cervical spine, upper extremities, and lumbar spine. (Tr. at 413).

Consequently, even considering the evidence in a light most favorable to Claimant, the medical records suggest that Claimant is only mildly limited in using his hands and arms, which is consistent with the conclusion of the ALJ in her RFC finding. (Tr. at 14). To the extent, if any, that the ALJ erred by not further discussing conflicts in the evidence, the undersigned finds this to be harmless error for several reasons. First, as noted, the RFC finding is supported by substantial evidence; therefore, discussing minor discrepancies in the medical records would not have altered the RFC assessment. Second, the ALJ conducted the requisite two-step process to determine the intensity and persistence of Claimant's impairments and reached a supportable determination that Claimant was not fully credible. Since many of the notations regarding Claimant's limited use of his upper extremities are based upon the subjective assertions of the Claimant, his lack of credibility is key to understanding the conclusions of the ALJ. Finally, any conflicting evidence contained in the opinions of the "other sources" is not entitled to the same weight as medical source opinions.   As such, Claimant's heavy reliance upon the opinion of a physical therapist is misplaced and, therefore, unpersuasive.

The ALJ properly articulated her analysis of the opinion evidence.  In making her RFC finding, the ALJ noted Dr. Giangarra's observations that Claimant was in no apparent distress with a normal gait and normal range of motion of his cervical spine, intact sensation, no significant tenderness or spasm of the lumbar spine, and was able to heel/toe walk. (Tr. at 16). The ALJ also considered Dr. Molano's consultative exam, which revealed questionable positive Tinel's sign on the left, but no atrophy of the thenar eminences. (*Id.*).  The ALJ discussed Dr. Ozturk's opinion that Claimant's upper

extremity movement was limited, but not painful. (*Id.*).  Finally, the ALJ considered the more recent statements of Dr. Caraway that Claimant had full range of motion of the cervical spine, lumbar spine, and upper extremities. (*Id.*).  In addition, the ALJ noted that many medical sources did not provide functional capacity assessments, including Putnam General Hospital, Merritts Creek Family Medical Center, Dr. Molano, Dr. Ozturk, and Dr. Caraway. (*Id.*).  The ALJ considered that in March and April 2006, independent physical therapy studies found Claimant capable of light or sedentary exertion and advised him not to lift 75 to 100 pounds. (*Id.*).  The ALJ further considered that the State agency and Generations similarly limited Claimant to light work. (*Id.*).

Therefore, the undersigned respectfully **PROPOSES** that the United States District Judge **FIND** that the ALJ fulfilled her duty with regard to examining and articulating her analysis of the opinion evidence as required by the applicable regulations, rulings, and case law.

### D.    Credibility

Claimant contends that the ALJ mistakenly assessed his credibility as "poor" based upon (1) an incorrect appreciation of the objective medical findings and (2) a faulty belief that Claimant was clinically mild with "no evidence of disc herniation," when, in truth, he had disc herniation.  (Pl.'s Br. at 9).  In support of his argument, Claimant refers to two medical records; an MRI of his lumbar spine taken in 2003 and a cervical spine MRI taken in January 2006.  (*Id.*)  Pointing to the 2003 MRI, Claimant argues that the film documents a disc herniation at L4-5 with borderline neural foraminal stenosis and a lesion within the anterior aspect of the T11 vertebral body. (*Id.*).  Additionally, the January 2006 cervical spine MRI showed a C4-5 posteriorly

bulging disc. (*Id.* at 9).   According to Claimant, these studies directly contradict the ALJ's statement that "there were minimal objective signs" of impairment.   (*Id.*)

In response, the Commissioner notes that the ALJ did not misunderstand or misstate the evidence.   To the contrary, the ALJ explicitly commented that while the results of the 2003 MRI showed disc herniation, a lumbar spine MRI taken in 2006 revealed no acute disc herniation, spinal canal or neural foraminal stenosis. (Tr. at 11-12, 323). In addition, the cervical MRI identified by Claimant expressly refuted the existence of focal disc herniation and confirmed that the vertebral height and alignment were normal; the spinal column was normal; and the marrow signal was normal. (Tr. at 11, 324).   Moreover, a cervical spine MRI taken in May 2008 showed only a "small" bulge at C4-C5 with no stenosis or neural foramina narrowing.   Accordingly, the ALJ correctly noted only "minimal findings" of impairment. (Def. Br. at 15). The Commissioner further argues that the ALJ applied the proper process in evaluating Claimant's credibility and reached her conclusion based upon the totality of the evidence, which is the extent of her duties.   (Def. Br. at 16-20).   After reviewing the record, the undersigned agrees with the Commissioner.

Claimant's challenge to the ALJ's credibility assessment is overly simplistic and fails to acknowledge the depth of the analytical process used by the ALJ in determining Claimant's credibility.    The ALJ's decision expressly confirms that she considered Claimant's credibility in keeping with the two-step process set forth in 20 C.F.R. §§ 404.1529 and described in SSR 96-7p.  According to this Social Security Ruling, when making a credibility assessment of a claimant's allegations of the intensity and persistence of symptoms, the ALJ must examine "the entire case record, including the

objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual." The ALJ is prohibited from rejecting a claimant's allegations **solely** on the basis that the symptoms are not substantiated by objective medical evidence, but may consider the lack of objective evidence or other corroborating evidence as factors in his decision. *Craig v. Chater,* 76 F.3d. 585 (4th Cir. 1996). SSR 96-7p clarifies the two-step process by which the ALJ must evaluate symptoms, including pain, under 20 C.F.R. §§ 404.1529, to determine their limiting effect on a claimant. First, the ALJ must establish whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms. SSR 96-7P. Once the ALJ finds that the conditions could be expected to produce the alleged symptoms, then the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id*. Whenever the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must make a finding on the credibility of any statements used to support their disabling effect. *Id.* The Ruling sets forth the factors that the ALJ must consider in assessing the claimant's credibility, emphasizing that the credibility determination must be based on a consideration of all of the evidence in the case record and the importance of explaining the reasons supporting the credibility determination. *Id.*

     In this case, the ALJ accepted that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms; thus, the ALJ

evaluated the intensity, persistence, and limiting effects of Claimant's symptoms to determine the extent to which they prevented him from working. The ALJ found that Claimant's statements concerning the intensity, persistence, and severity of his symptoms were excessive and not credible, because they were inconsistent with other evidence in the record, including descriptions of Claimant's daily activities; the documented location, duration, frequency, and intensity of Claimant's symptoms; the lack of mental health care and treatment; visible discrepancies between Claimant's self-described restrictions and his actions; reports regarding his lack of effort when tested; the absence of any recommendation for surgery despite persistent complaints; and the nature of Claimant's medications. (Tr. at 18-20). The ALJ cited to specific pieces of evidence contained in the record that formed the basis of her doubt.   ( *Id.*).

When evaluating whether an ALJ's credibility determinations are supported by substantial evidence, the Court is not charged with simply replacing its own credibility assessments for those of the ALJ; rather, the Court must review the evidence to determine if it is sufficient to support the ALJ's conclusions. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence . . . or substitute its own judgment for that of the Commissioner." *See Hays v. Sullivan,* 907 F.2d. 1453, 1456 (4th Cir. 1990).  Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler,* 739 F.2d 987, 989-990 (4th Cir. 1984), citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976). Further review of the medical record in this case substantially supports the ALJ's belief

that there were minimal objective findings to support Claimant's complaints, that his condition was clinically mild with no disc herniation, and that his credibility was poor.

Thus, the undersigned respectfully **PROPOSES** that the United States District Judge **FIND** that the ALJ's credibility determination was supported by substantial evidence.

### E.    Claimant's Age

Claimant's final argument is that the ALJ erred in not taking into consideration the "important factor" that he would turn 55 years old within six months of the ALJ's decision. (Pl.'s Br. at 10). Claimant's argument presumably references the medical-vocational rules listed in Appendix 2 of Subpart P of Part 404 ("grids") under which the age of 55 carries special significance in determining the ability of an individual to perform basic work activities. *See* 20 C.F.R. Chapter III, Pt. 404, Subpt. P, App.2, §§ 200.00-204.00 (2009). As previously discussed, the Commissioner bears the burden of going forward with the evidence at the fifth step of the sequential evaluation and must show that a claimant, who is precluded from performing past relevant work, is able to perform other forms of substantial gainful activity. 20 C.F.R. § 404.1520(f) (2009).  The Commissioner must not only demonstrate the claimant's ability to perform at a particular exertional level, but must also prove that jobs exist in the national economy that can be performed by the claimant despite his or her individual restrictions.

One way to meet this burden is through the use of the "grids." The Regulations establish "grids" which "take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity." *Grant v. Schweiker,* 699

F.2d 189, 191-92 (4th Cir. 1983); *see generally* 20 C.F.R. Chapter III, Pt. 404, Subpt. P, App.2, §§ 200.00-204.00 (2009). Each grid considers the strength or "exertional" component of a claimant's disability in determining whether jobs exist that a claimant could perform in light of the vocational factors. *Grant,* 191-92; 20 C.F.R. Chapter III, Pt. 404, Subpt. P, App.2, §§ 200.00-204.00 (2009). In a case where the claimant has only exertional impairments, the grids may be applied and vocational expert testimony is not required. *See Hays v. Sullivan,* 907 F.2d 1453, 1458 (4th Cir. 1990).

The Regulations also establish particular age categories that are presumed to affect an individual's ability to work, including: (1) younger person (under age 50), (2) a person closely approaching advanced age (age 50-54), and (3) a person of advanced age (age 55 or older). 20 C.F.R. § 404.1563(c)-(e) (2009). The claimant's age at the time of the ALJ's decision governs in applying the grids. *See Varley v. Secretary of Health & Human Serv.,* 820 F.2d 777, 780 (6th Cir. 1987).   However, in cases in which the claimant is on the borderline between two age categories, the ALJ must determine whether to use the higher age category, or the claimant's chronological age when applying the grids. 20 C.F.R. § 404.1563(b).

In this case, at the time of the ALJ's decision, Claimant was 54 years old, defined as a person "closely approaching advanced age," and was six months away from turning 55 years old, defined as a person of "advanced age." Claimant had a high school equivalent degree and a past relevant employment history of unskilled work. Therefore, considering these factors, and hypothetically assuming that Claimant was exertionally limited to "light" work with no non-exertional limitations, the grids would direct a finding of "not disabled" under the closely approaching advanced age category, but

"disabled" under the advanced age category. 20 C.F.R. Chapter III, Pt. 404, Subpt. P, App.2, §§ 200.00-204.00. Accordingly, under this hypothetical factual scenario, the ALJ would have been required to decide which age category should have been applied in Claimant's case. The ALJ would not have been required to explain her decision, but the record must contain "some indicia that application of the higher age category was not warranted." *See Bush v. Astrue*, 2008 WL 867941 *6 (S.D.W.Va. 2008).

However, here, Claimant was found to have non-exertional limitations, in addition to his exertional limitations, and thus, the ALJ did not mechanically apply the grids. Rather, the ALJ utilized the assistance of a vocational expert to consider all of Claimant's individual vocational factors and determine whether jobs existed in significant numbers in the national economy which Claimant could perform. The ALJ asked the vocational expert whether an individual of Claimant's age, education, and work history, *with his unique exertional and non-exertional limitations*, was capable of performing jobs which existed in significant numbers in the national economy. (Tr. at 36-37). The ALJ responded that at the light level, Claimant was capable of working as an amusement and recreational facilities attendant, a machine tender, and a counter clerk. (Tr. at 36-37). At the sedentary level, Claimant could work as an assembler, inspector, or a security monitor, although the assembler job category would be affected and the inspector positions would be reduced by half due to Claimant's restricted use of his hands. (Tr. at 37). Because the ALJ employed the services of a vocational expert, who performed an individualized analysis of the jobs categories that could be performed by Claimant, taking into consideration his age, experience, education and limitations, Claimant's argument has no merit.

Therefore, the undersigned respectfully **PROPOSES** that the United States District Judge **FIND** that the ALJ considered Claimant's age at step five of the sequential analysis in accordance with all regulations, rulings, and case law.

## VIII.  <u>**Recommendations for Disposition**</u>

Based on the foregoing, the undersigned Magistrate Judge respectfully **PROPOSES** that the United States District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** plaintiff's Motion for Judgment on the Pleadings (Docket No. 11); **GRANT** defendant's Motion for Judgment on the Pleadings (Docket No. 12), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Plaintiff shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S.

140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  February 2, 2011.

Cheryl A.  Eifert
United States Magistrate Judge